## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEVEN W. ALLBRIGHT, | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO.  PWG-13-1529 |
| | | |
| GARY MAYNARD, | * | |
| RANDY WATSON, | | |
| KATHLEEN GREEN, | * | |
| WEXFORD HEALTH SOURCES, INC., | | |
| DR. DAVID M. MATHAIS, | * | |
| DR. PAUL MATERA, & | | |
| DR. SUNDAY NWSOU, | * | |
| Defendants. | | |

\*\*\*\*\*

### MEMORANDUM

Steven W. Allbright, a former Maryland inmate, filed this action pursuant to 42 U.S.C.

§ 1983, seeking declaratory and injunctive relief, as well as compensatory damages, for alleged

Eighth Amendment violations resulting from delays in providing the medical care Allbright

requested. He names as defendants the Secretary of the Department of Public Safety & Correctional

Services ("DPSCS"), the Regional Director of the Maryland Division of Correction, the Warden of

the Eastern Correctional Institution ("ECI"), Wexford Health Sources, Inc., and Drs. David M.

Mathais, Paul Matera, and Sunday Nwosu.[1]   All Defendants move to dismiss or, alternatively, for

summary judgment. Because the undisputed facts show that Allbright's medical care did not amount

to "deliberate indifference" in violation of the Eighth Amendment, and Defendants are entitled to

---

[1]    The docket shall be amended to reflect the correct name of Dr. Nwosu. Dr. Mathais never
was served. Because judgment in favor of Defendants is appropriate, Plaintiff's claim against Dr.
Mathais shall be dismissed. References to "Defendants" do not include Dr. Mathais. Plaintiff's
Motion for Summary Judgment as to Dr. Mathais, ECF No. 42, is denied as moot in light of this
ruling.

judgment as a matter of law, I will treat Defendants' motions as motions for summary judgment and grant them.

## I.    THE FACTS AS PLEADED

In his Verified Complaint, ECF No. 1, Allbright states that in June of 2010, he sustained a sports-related injury to his left shoulder and filed a sick-call request complaining of limited range of motion ("ROM") and severe pain. Compl. ¶ 12. He claims that he was seen by a nurse, given pain medication, and no other action was taken. *Id.* Allbright contends that over the course of the next five months he repeatedly requested medical care and was told he would receive a shoulder consultation, but it was not until November 29, 2010 that an x-ray was ordered for his shoulder. *Id.* ¶¶ 13–16. He contends, however, that this order was lost and he did not receive the x-ray until three months later, in January of 2011. *Id.* ¶¶ 18–21.

Allbright provides a timeline of his medical care regarding his shoulder following the x-ray. He alleges that in February of 2011, he was seen by a physical therapist, who "indicated [that there were] clinical signs of Rotator Cuff Pathology. *Id.* ¶¶ 22. He claims that throughout February and March of 2011, he received physical therapy ("PT") for documented $AC^2$ joint instability. *Id.* ¶¶ 22–27. Allbright claims that, when he "was seen by [physician's assistant] Jessica Cecil for follow-up," Cecil exhibited "extreme agitation and lack of interest . . . toward his medical needs." *Id.* ¶ 26. Allbright contends that in April of 2011, in response to a "complaint" he filed with Senator Barbara Mikulski, he received "legal mail" noting that he had been diagnosed with bursitis. *Id.* ¶ 31. His

request for an "Orthopedic consultation" was denied in May 2011, and he was told that he needed to have a colonoscopy before his shoulder was addressed. *Id.* ¶ 34, 36. He had the colonoscopy in early June 2011 and requested a shoulder consultation one week later and two weeks after that. *Id.* ¶ 38–39. A physician's assistant saw him about his shoulder in early July, but "could not locate last therapist notes" and told Plaintiff he would have to "get back to" him. *Id.* ¶ 41. Allbright requested care repeatedly and, in September of 2011, he was seen by an orthopedic surgeon and had an x-ray taken and was recommended for an MRI. *Id.* ¶¶ 43–45, 47, 51. Allbright states that in November of 2011, he was seen by Dr. Paul Matera for shoulder issues and was diagnosed with a rotator cuff tear and mild "tendinosis." *Id.* ¶¶ 59–60. He claims that in February of 2012, he finally underwent rotator cuff surgery at Bon Secours Hospital ("BSH"). *Id.* ¶¶ 84.

Allbright additionally complains about the delays in receiving a colonoscopy and treatment for a hydrocele[3] or hernia. He asserts that, although a urology consult and ultrasound were recommended in 2011 for examination of the hydrocele or hernia, the requests were denied. Compl. ¶¶ 59–65. According to Plaintiff, "Dr. Matera appeared disturbed by this and stated he would immediately resubmit." *Id.* ¶ 65. Allbright contends that he did not receive a colonoscopy

---

[2]    The "AC" joint is a joint in the shoulder where two bones, the acromion, which is part of the scapula, and the clavicle, meet. *See* www.hopkinsortho.org/ac_joint.html.

[3]    A hydrocele is a fluid-filled sac surrounding a testicle that results in swelling of the scrotum, the loose bag of skin underneath the penis. They are common in newborns, but most hydroceles disappear without treatment within the first year of life. Older boys and adult men can develop a hydrocele due to inflammation or injury within the scrotum.

Hydrocele, http://www.mayoclinic.com/health/hydrocele/DS00617.

until June of 2011, and despite repeated "sick-call request[s]," he did not receive an ultrasound for

his scrotum until June of 2012. *Id.* ¶¶ 38, 68, 75, 82, 88, 99–101, 122. He "was seen at bon Secours

Hopsital for left inguinal exploration with left hydrolectomy [sic] and left orchiopexy."[4]  *Id.* ¶¶ 126.

Allbright claims that he did not receive hernia surgery until January of 2013. *Id.* ¶¶ 146.

## II.   PENDING MOTIONS

Defendants ECI Warden Green, DPSCS Secretary Maynard, and Division of Correction

Regional Director Watson ("State Defendants"), Dr. Matera, Wexford Health Sources, Inc.,[5] and Dr.

Nwosu have filed motions to dismiss or, in the alternative, motions for summary judgment. ECF

Nos. 20, 25, & 30. Defendants rely on materials outside of the pleadings, such as declarations and

medical records. Therefore, I shall treat their motions as motions for summary judgment. *See* Fed.

R. Civ. P. 12(d); *Ridgell v. Astrue*, DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012).

Allbright has filed three Motions to Deny or Stay, Defendents [sic] Motion to Dismiss or in the

Alternative Motion for Summary Judgment, which I construe as Oppositions.[6] ECF Nos. 28, 38, 39;

---

[4]      Hydrocelectomy, also known as hydrocele repair, is a surgical procedure to correct a
hydrocele. *See* http://www.surgeryencyclopedia.com/Fi-La/Hydrocelectomy.html#ixzz39iPwf0N6.
Orchiopexy (or orchidopexy) is a surgery to move an undescended testicle into the scrotum and
permanently fix it there. *See* www.healthline.com.

[5]      Defendants Wexford and Nwosu have filed a motion to seal asking that their dispositive
motion be placed under seal in its entirety due to the sensitive nature of the medical materials.
ECF No. 46. This motion, which is not ripe yet, remains pending. *See* Loc. R. 105.11 (stating
that motions to seal must be on the docket for fourteen days before the Court rules).

[6]      Allbright also has filed a motion for reconsideration of the Court's decision denying his
motion to amend. ECF No. 40. On October 29, 2013, the Court denied Allbright's request to amend
his complaint to include Corizon, Inc. as a party defendant. ECF No. 37. Allbright contends that
Corizon, Inc. may be held liable for the failure of its medical personnel to answer his sick-call
requests and for delays in his treatment. The motion for reconsideration shall be denied for those

*see* Fed. R. Civ. P. 1. Wexford and Nwosu filed a reply to one of Allbright's Oppositions. ECF No.
41. The Court concludes that the pending motions may be determined without hearing. *See* Loc. R.
105.6 (D. Md. 2014).

## III.  STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts
of materials in the record, including depositions, documents, electronically stored information,
affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials,"
that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a), (c)(1) (A); *see Baldwin v. City of Greensboro,* 714 F.3d 828,
833 (4th Cir. 2013). The Court considers evidence related to a motion for summary judgment in the
light most favorable to the non-moving party, drawing reasonable inferences in its favor. *See Ricci v.
DeStefano,* 557 U.S. 557, 586 (2009); *see also George & Co., LLC v. Imagination Entm't Ltd.,* 575
F.3d 383, 392 (4th Cir. 2009).

If the party seeking summary judgment demonstrates that there is no evidence to support the
nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows
that a genuine dispute exists as to material facts. *See Celotex v. Catrett,* 477 U.S. 317, 322–23
(1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary
judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Instead, the evidentiary
materials submitted must show facts from which the finder of fact reasonably could find for the party
opposing summary judgment. *Id.* at 252.

---

reasons previously articulated by the Court. *See id.*

5

## IV.    PARTIES' ARGUMENTS

The State Defendants maintain that at no point in the complaint has Allbright alleged their participation in or interference with his medical treatment. State Defs.' Mem. 1–2, ECF No. 20-1. They argue that "[t]here is no *respondeat superior* liability under § 1983." Mem. 6. They submit supporting affidavits. Thomas Sullivan, the Chief Executive Director of the Health Services Unit for DPSCS, declares that the DPSCS has "delegated full operations and compliance monitoring enforcement over the vendors supplying medical care to Maryland inmates to the Office of the Chief Executive Director of Health Services." Sullivan Decl. ¶ 2, State Defs.' Mem. Ex. A, ECF No. 20-2. He asserts that "[i]t is the responsibility of the vendor, not correctional staff, to provide medical services under the specifications of the contract." *Id.* He declares that DPSCS "staff have no personal involvement in the provision of medical care to any Maryland inmate, and have no authority to make decisions concerning any individual inmate's medical care." *Id.* ¶ 3. Green states that she, Maynard, and Watson do not play personal roles in providing medical treatment and that they have no authority regarding providing medical treatment. Green Decl. ¶ 2, State Defs.' Mot. Ex. B, ECF No. 20-3. According to Green, she "did not interfere with or impede any medical care provided to the Plaintiff while housed at ECI." *Id.* She states that they "rely on the expertise and opinions of trained medical personnel" in answering any administrative remedy procedure ("ARP") grievance that inmates file concerning a medical care claim. *Id.* ¶ 4.

In his September 27, 2013 Opposition, Allbright counters that it took twenty months to obtain surgical repair of his rotator cuff, ten months to surgically repair his hydrocele, and sixteen months to surgically repair his hernia. Sept. 27, 2013 Opp'n 2. He contends that his suit against the State Defendants is based upon the fact that prison officials may be held liable for acting with deliberate

6

indifference to his health and safety and that letters and ARPs to Congressional representatives and DPSCS administrators regarding his medical concerns were sufficient to place the State Defendants on notice of the risks to his health. *Id.* at 4–5.

Dr. Matera claims that Allbright has failed to assert any "specific scenarios in which the physician misdiagnosed, mistreated, or provided inadequate medical care" to him. Matera Mem. 1. Dr. Matera argues that any interaction alleged to have occurred between him and Allbright shows that Allbright received "necessary medical treatment" from the physician for his hydrocele or hernia. *Id.* at 9–13. In attached exhibits, he notes that his interactions with Allbright primarily involved issues concerning Allbright's hydrocele. He maintains that beginning in September of 2011, he ordered a scrotal support, educated Allbright in manual decompression, requested a scrotal ultrasound to determine whether it was a simple hydrocele or an involved hernia, and requested a hydrocele consult, which was deferred by the utilization review in December of 2011. *Id.* at 10–11. As of April of 2012, however, a urology consultation for Allbright's hydrocele had been submitted, approved, and done at BSH. Matera Mot. Exs. 1–11, ECF Nos. 25-3 – 25-13.

Wexford and Nwosu (the "Wexford Defendants"), like the State Defendants, argues that it "cannot be held liable" because "the doctrine of respondeat superior does not apply in § 1983 claims." Wexford Mem. 20, ECF No. 30-3. They insist that "Plaintiff has not set forth sufficient facts to establish that Defendants knowingly failed to provide constitutionally adequate medical care to a serious medical need, much less that Defendants acted with deliberate indifference." *Id.* at 22.

In his Oppositions, Allbright argues that he suffered "unwarranted emotional and severe physical distress" due to the failure to receive "adequate and timely prompt medical care" for his conditions. Sept. 27, 2013 Opp'n 2; Nov. 22, 2013 Opp'n Mem. 1, ECF No. 39-1. Although he

7

concedes that "Physical Therapy prior to diagnostic testing, seems reasonable," such that "it could be agreed that the initial course of treatment was prudent," he finds fault in the subsequent delay of further treatment, such as surgery, despite a large number of sick-call requests from Plaintiff "documenting servere [sic] pain and limited range of motion." Nov. 22, 2013 Opp'n Mem. 15. He insists that "he was left to endure servere [sic] abdominal and testicular pain," without "being offered any pain medication except ibuprofen but in one instance." Nov. 5, 2011 Mem. 7, ECF No. 38-1. Plaintiff argues that Defendants' deliberate indifference caused him "frustration and embarrassment" because the medical staff delayed treatment while his left testicle grew rapidly, reaching the size of a grapefruit, at which point "Plaintiff received a DPSCS medical assignment form to be carried with him at all times, due to the frequincies [sic] in which Correctional Staff stopped him believing he has [been] transporting contraband in his pants." *Id.* at 9. Additionally, he argues that he "had to endure unsanitary conditions when using the bathroom as his hydrocele commonly sat (rested) in the toilet water" when he sat on the toilet. *Id.* at 10.

He insists that the procedure outlined in Wexford's contract provided that "requests for specialty services . . . , such as orthopedic care, pain management, surgery, MRI tests required collegial review by Wexford for approval." Nov. 22, 2013 Opp'n Mem. 12. Plaintiff argues that "a fully torn rotator cuff tendon, a very large hydrocele and hernia could qualify as serious medical issues," such that "[p]rison official who have been alerted to the plaintiff[']s serious medical needs have and are under obligation to offer medical care." *Id.* at 13. He contends that Wexford is subject to liability under *Monell* because it has a "policy to deny or defer specialty care or treatment," such as for Plaintiff's shoulder injury and hydrocele. *Id.* at 14. In his view, discovery is needed to bring to light "how many other convicted prisoner claims for specialty care w[]ere deferred or denied." *Id.*

8

## V.   ADDITIONAL EVIDENCE

Plaintiff and the Wexford Defendants attach Plaintiff's medical records, *see* Nov. 5, 2013 Opp'n Exs. 1-11 & 12-23, ECF Nos. 38-2 & 38-3; Med. Recs., Wexford Mem. Ex. 3, ECF No. 30-6, which document the following history.

In December of 2010, Allbright, who was in his late forties, requested a colonoscopy in light of his family history of colon cancer and a recommendation that one occur every three to five years. The consultation request was submitted and approved, and the colonoscopy procedure occurred on June 7, 2011. Med. Recs. 2–4, 8, 19–20. On January 10, 2011, Allbright was seen by a physician's assistant for complaints of left shoulder pain. A consult request for PT was submitted and Allbright was approved for six sessions of PT. Ebbitt Aff. ¶ 11, Wexford Mem. Ex. 1, ECF No. 30-4; Authorization 5, Wexford Mem. Ex. 2, ECF No. 30-5; Med. Recs. 9–10. Additional PT was recommended and approved on two separate occasions in March and May of 2011. Ebbitt Aff. ¶¶ 12–13; Med. Recs. 11–13 & 18.

In September of 2012, a request for an orthopedist assessment was submitted and approved. Allbright was assessed by the orthopedist as having arthritis of his left AC joint "with probable rotator cuff tear." Med. Recs. 22. The orthopedist recommended that Allbright have an MRI taken of his left shoulder and that he follow up with the orthopedist when the results were received. A consultation request for the MRI was approved on October 12, 2011, and the follow up appointment was also approved. Ebbitt Aff.; Authorization 10; Med. Recs. 22–23.

On November 4, 2011, the MRI results were received. Allbright was assessed as having a "full thickness rotator cuff tendon tear with a borderline typed 3 hooked acromion," most commonly related to shoulder impingement. Med. Recs. 26. He was scheduled for a follow up visit with the

9

orthopedist. It was recommended that Allbright have a surgical repair of the rotator cuff. This recommendation was approved and he was scheduled for surgery. On February 16, 2012, Allbright had rotator cuff surgery at BSH and post-operative PT was approved. Authorization 12; Med. Recs. 34–35.

On November 2, 2011, Dr. Matera saw Allbright regarding his complaint that support and compression were not reducing his hydrocele. Matera was unable to diagnose whether the condition was a hydrocele, inguinal hernia or both and placed a consultation request for an ultrasound and urologist evaluation. Med. Recs. 24. The request was deferred pending receipt of additional information as to whether the mass was transilluminate.[7] Ebbitt Aff. ¶ 16; Authorization 9; Med. Recs. 27. On December 28, 2011, Allbright was seen by Dr. Matera, who observed that it was necessary to ensure that Allbright's diabetes[8] was stable on insulin and have the orthopedic issue with his shoulder resolved before the hydrocele issue could be addressed fully. Med. Recs. 30–33.

On March 30, 2012, Matera saw Allbright for complaints regarding his hydrocele. A urology consult was approved on March 28, 2012. Ebbitt Aff. ¶ 19; Med. Recs. 38–39. Allbright saw Dr. Scipio, a urologist, at BSH. Scipio diagnosed a "possible left inguinal hernia" and recommended an ultrasound and a general surgery consultation. Med. Recs. 40. The treatment for the hydrocele was deferred after Allbright's shoulder issues were resolved. *Id.* On May 11, 2012, Dr. Tewelde reexamined Allbright and recommended that he receive a consultation for an ultrasound. The consultation was approved. *Id.* at 42–44; Authorization 13. The ultrasound determined that

---

[7]     Transillumination is the shining of a light through a body area or organ. *See* www.nlm.nih.gov/.../003389 By holding a light behind the scrotum one can easily determine whether the mass is cystic (light shines through) or solid (light blocked by the mass).

[8]     Allbright has diabetes mellitus type II. Nwosu Aff., Wexford Mem. Ex. 4, ECF No. 30-7.

Allbright had a bilateral hydrocele with vascular implications. He was referred to Dr. Scipio for a hydrocelectomy. Ebbitt Aff. ¶ 21; Authorization 16; Med. Recs. 45. On July 9, 2012, Allbright had surgery for a "[left] hydrocelectomy with orchiopexy" and "a [left] inguinal exploration." Med. Recs. 47–48.

Allbright was admitted to the infirmary upon his release to the Metropolitan Transition Center, where he walked with an unsteady gait, but denied pain. Dr. Agonafir saw him the following day for a post-surgical follow up. He reported that pain at the surgical sites was subsiding. Later that night he was seen by Nurse Adediji and was found to be in no apparent distress. Med. Recs. 50–55. Over the course of the next two days he was seen by nurses, physician's assistants, and physicians. He was found to be recovering well and was alert, oriented and walking with either "mild limping" or "a steady gait." *Id.* at 56–67. Allbright was monitored twice a day but refused medical care between July 13 and 15, 2012 and asked to be released to the general population. *Id.* at 68–75. He was released from the infirmary and transferred to the Baltimore City Correctional Center and seen by Dr. Tewelde on July 17, 2012. *Id.* at 76–89 & 95–96. The surgical site had staples in it and was found to be clean and dry, without "edema or cyanosis." *Id.* at 95–96. Allbright was referred to Dr. Scipio for follow-up and was seen by the doctor at BSH on July 24, 2012. The wound was found to be "clean and intact." *Id.* at 98. There was, however, some "induration of the [left] testes [with] fluid collection." *Id.* Staples were removed and steri-strips were applied. *Id.*

Three days later Allbright had a full physical. He was dissatisfied with the surgical results. The site was observed to have a good reduction in size, but had a moderate amount of hydrocele fluid. *Id.* at 99–114. On August 20, 2012, he was seen by Dr. Nwosu in the Chronic Care Clinic ("CCC"). The examination revealed a normal scrotum, with no masses or tenderness and symmetric

11

and non-tender testes. *Id.* at 119–21. In September of 2012, Allbright was seen again by Dr. Nwosu at sick call, where it was observed that his hydrocele was re-accumulating. He was examined by Dr. Scipio at BSH on September 18, 2012. *Id.* at 123–25. The examination revealed an enlarged left hemiscrotum with transillumination. Allbright was assessed as having a "communicating left inguinal hernia"[9] and left hydrocele and it was recommended that he be scheduled for a hernia repair and hydrocelectomy. *Id.* at 125. Allbright was seen by Dr. Nwosu for a follow-up on the consult with Dr. Scipio. A consultation request for general surgery with Dr. Youssef was approved on September 25, 2012.

Allbright refused to go to BSH for the general surgery and demanded a second opinion from Johns Hopkins University. He claimed that he was having pain when using the restroom and when lying down, asserted that the hydrocele was painful and the size of a baseball, and stated that he did not want the same surgery again. *Id.* at 126–33; Nwosu Aff., Wexford Mem. Ex. 4, ECF No. 30-7. In November of 2012, however, Allbright indicated that he wanted the hydrocele and hernia surgery. Med. Recs. 135. As the surgery had previously been approved, the authorization number was sent out to schedule a surgical appointment. *Id.*

On December 27, 2012, Allbright was seen by Dr. Nwosu for a pre-operative history and physical examination. He manifested symptoms of pain in the left inguinal region and minimal testicular swelling. His scrotum was found to be normal, but the left inguinal canal was tender. *Id.* at 142–44. On January 9, 2013, Allbright underwent exploratory left inguinal surgery, performed by Dr. Yassar Youssef at BSH. The surgery identified "some weakness to the epigastric vessels" and

---

9 An inguinal hernia occurs when soft tissue-usually part of the membrane lining the abdominal cavity (omentum) or part of the intestine — protrudes through a weak point in the

a "mesh [was inserted] to repair the weakness."[10] *Id.* at 147–48. He was admitted to the MTC

infirmary that same date and although he complained of wound pain, Allbright was found to be in no

apparent distress. His dressing was clean and dry, and an ice pack and scrotal support was provided.

*Id.* at 149–55. Follow-up care occurring over the course of the following two months noted that

Allbright was recuperating well, the site was clean and dry, and no erythema (skin redness) was

observed. *Id.* at 156–62. On May 13, 2013, Allbright declined to be seen further in the CCC. He

was evaluated by mental health staff and deemed competent to make that decision. *Id.* at 175.

## VI.   ANALYSIS

The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton

infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v.*

*Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those

punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330

F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)). To state an Eighth

Amendment claim for denial of medical care in prison, a plaintiff must demonstrate that the actions

of the defendants or their failure to act amounted to deliberate indifference to the inmate's serious

medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225,

241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that,

objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively,

---

abdominal muscles. *See* www.mayoclinic.org/.../inguinal-hernia/basics/.../con-20021.

[10]   During the January 9, 2013 surgery, the surgeon recommended an ultrasound be conducted to determine if a mass on the left testicle was a tumor or inflammatory reaction. A consultation request was made for the ultrasound, which was conducted on February 22, 2013, and Allbright's testes were found to be normal, with no mass. A small right hydrocele was noted, with a small subcutaneous cyst (abnormal membrane sac) found on the left scrotum. Med. Recs. 167-76.

the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[11] *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer,* 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.,* 58 F. 3d 101, 105 (4th Cir. 1995) (*quoting Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown,* 240 F. 3d at 390 (citing *Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin,*

---

[11]     A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241 (citing to *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)).

804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the

necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429

U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*,

423 F. Supp. 2d 1064, 1070–71 (C.D. Cal. 2006).

Insofar as the Complaint names DPSCS Secretary Gary Maynard, Division of Correction

Regional Director Randy Watson, and ECI Warden Green as defendants, there is no allegation or

showing that they were personally involved in Allbright's medical care while he was incarcerated at

ECI. Allbright has provided no evidence demonstrating their supervisory liability. *See Shaw v.

Shroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990).

Consequently, the State Defendants' motion to dismiss or, in the alternative, motion for summary

judgment shall be granted.

Further, the exhibits show that Allbright is a 51-year-old male who reported a shoulder injury

in mid-2010 and an enlargement to his scrotum in 2011. He first received conservative treatment in

the form of PT sessions over the course of several months for his shoulder and decompression and

support for his hydrocele/hernia. He agrees that "Physical Therapy prior to diagnostic testing, seems

reasonable," and that "it could be agreed that the initial course of treatment was prudent." Nov. 22,

2013 Opp'n Mem. 15. Allbright was seen by nurses, physician's assistants and physicians, both on-

site and in local hospitals; received evaluation from orthopedists and surgeons; was subject to a

variety of tests at BSH and in the CCC; and ultimately received rotator cuff surgery and

hydrocelectomy and hernia procedures. While it appears that Allbright did not receive the care as

rapidly as he would have liked, the delays which occurred do not appear to have transpired through

the intentional acts of health care staff. While Plaintiff may be dissatisfied with the cautious course

of treatment, the evaluations and surgeries met the minimum constitutional requirements. No Eighth Amendment violation has been demonstrated.

## VII.   CONCLUSION

Having found no genuine dispute of material fact justifying a trial on the merits in this case, Defendants' motions for summary judgment shall be granted. Plaintiff's claim against Dr. Mathais shall be dismissed, and Plaintiff's Motion for Summary Judgment as to Dr. Mathais, shall be denied as moot in light of this ruling. A separate Order will issue.

Date: August 15, 2014                              /S/

Paul W. Grimm
United States District Judge

16